**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| TRIVISTA OIL CO., LLC, | ) | Case No. 26-32229 |
| | ) | |
| Debtor. | ) | Chapter 11, Subchapter V |
| | ) | |
| In re: | ) | |
| | ) | |
| TRIVISTA OPERATING LLC | ) | Case No. 26-32231 |
| | ) | |
| Debtor. | ) | Chapter 11, Subchapter V |
| | ) | |

**DECLARATION OF ROBERT T. BLACK IN SUPPORT OF FIRST DAY MOTIONS**

I, Robert T. Black, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the President and CEO of NRF USA, Inc. ("NRF USA"), the sole member of both Trivista Oil Co., LLC ("Trivista Oil") and Trivista Operating LLC ("Trivista Operating," and together with Trivista Oil, "Trivista" or the "Debtors"). I have been designated as the "responsible person" for each of the Debtors in connection with their chapter 11 cases.

2.      Except as otherwise indicated, the facts described in this Declaration are based on my personal knowledge, my review of relevant documents (including the Debtors' books and records), information provided to me by the Debtor's former employees, or my discussions with the Debtors' advisors. If called upon to testify, I believe I would testify competently to the facts set forth in this Declaration.

**A. Debtor's Background and Financial Condition**

3.        The Debtors are Southeast Texas oil and gas producers. Trivista Oil owns leases comprising approximately 16,000 gross acers and 315 wells in the Taylor Sands field. Trivista Oil also owns its real property, at which its field office is located, as well as potentially other mineral interests. Trivista Operating conducts the operations at the wells. The Debtors historically produced approximately 4,000-4,500 bbl/month. The wells and leases owned or managed by the Debtors are reflected in the image below.



4.        Black Acre, LLC ("Black Acre"), an entity of which I am the manager, acquired the parent company of NRF under an agreement dated March 20, 2026. A copy of the Assignment and Assumption by which Black Acre acquired the equity interests is attached hereto as Exhibit A. I executed the Assumption and Assignment on behalf of Black Acre.

5.        Under prior ownership, the Debtors were unable to continue operations. By the time I took over management of the Debtors, the Debtors had ceased operations.

2

6.     After Black Acre's acquisition, I reviewed the Debtors' available accounting records.  The Debtors' books had not been properly closed or reconciled since at least October 2025.  The Debtors have on aggregate approximately $2.5 million of noncontingent liquidated debts. Of this amount, approximately $1 million is owed to trade vendors. Approximately $1.5 million appear to relate to unpaid royalty obligations. Against that, I believe that the Debtors' oil and gas assets have a value of between $5.0 and $7.0 million, not including potential litigation claims. The Debtors have additional tangible assets.

7.     Additionally, the Debtors available accounting records include purported obligations to the prior ownership and their affiliates.  Trivista Operating has approximately $5.0 million in obligations reflected in its books that are owed to prior ownership or their affiliates. The largest of these obligations includes an entry of $3.5 million as an account payable due to "Trason Holdings" dated December 31, 2021.  Trivista Oil's records include a purported loan obligation due to prior ownership or their affiliates in the amount of $1.9 million. These obligations were recorded in the records while the prior ownership still held the ownership and control over the Debtors.  I believe that the purported obligations due to prior ownership and its affiliates are not reflected in notes or other writings, and the available accounting records indicate that there were no regular or recurring payments made on account of the purported obligations. For instance, no payments were identified related to the purported obligation To Trason Holdings, despite being booked over five years ago. The Debtors believe that these amounts are more properly characterized as equity contributions, to the extent that they represent actual payments made to or on behalf of the Debtors.

8.     The Debtors intend to restart operations and use the operating revenue to reorganize. The Debtors anticipate funding the restart of operation and reorganization of the

Debtor by (a) accessing available funds at Classic Bank and (b) obtaining post-petition financing. The Debtors are negotiating post-petition financing in an amount of up to $2.5 million and anticipate seeking the Court's approval in the early part of the case.

**B. Classic Accounts Motion**

9. Trivista Oil and Trivista Operating each have accounts at Classic Bank. These include the checking accounts ending in x0976, x6318, and x1974 (the "Classic Accounts"). I have not identified any lien attaching to the Classic Accounts and believe that there are unencumbered funds available in those accounts.

10. After Black Acre acquired the Debtors through its parent companies, the Debtors contacted Classic Bank to effectuate the change of control over the Classic Accounts. I had the necessary paperwork prepared, including amended signature cards, and provided the documents to Classic Bank. To date, however, Classic Bank has not provided access to the Classic Accounts. I believe that the Classic Accounts remain under the control of the Debtors' prior ownership.

11. Based on the foregoing, I directed proposed counsel to the Debtors to file the Debtors' Emergency Motion for (A) Clarification Regarding Ownership and (B) Authority to Modify Signature Cards for Bank Accounts. I believe that the relief therein is necessary for the Debtors to obtain control over the funds in the Classic Accounts, rehire key personnel, and restart operations.

**C. Motion to Authorize Payment of Outstanding Payroll Obligations**

12. The Debtors employed or recently employed seven (7) employees. Five (5) of the employees participated directly in the Debtors' hydrocarbon production efforts, including a field supervisor, a pumper operator, and truck drivers/operators. The remaining two (2) employees performed administrative functions, including accounting and record keeping activities. None of

these employees are directly involved in the Debtors' management functions. I believe these employees are essential to the Debtors' continued operations, going concern value, and ability to generate revenue from oil and gas operations.

13. After Black Acre's acquisition, I discovered that the Debtors had failed to make payment of wages, salaries, other compensation, and reimbursable expenses owed to employees after the previous owner's acquisition of the Debtors in February 2026. The Debtors' estimate of the outstanding obligations for these employees through the payroll period ending April 10, 2026 is reflected in Exhibit A to the Debtors' Emergency Motion for Order (a) Authorizing the payment of Prepetition Wages, Salaries, Other Compensation, and Reasonable Expenses and (b) Granting Related Relief. From my conversations with the employees, I believe the employee will likely seek employment elsewhere if the Debtors fail to honor their outstanding obligations.

14. Based on the foregoing, I directed proposed counsel to the Debtors to file the Debtors' Emergency Motion for Order (a) Authorizing the payment of Prepetition Wages, Salaries, Other Compensation, and Reasonable Expenses and (b) Granting Related Relief. I believe that the relief therein is necessary for the retain key employees necessary for the quick and efficient restart of the Debtors' operations.

### D. Motion for Extension of Time to File Schedules and Statements

15. The Debtors' employees and contractors were furloughed or terminated prior to the commencement of their chapter 11 cases. These personnel had the institutional knowledge necessary not only to restart the Debtors operations but also prepare adequate schedules and statements required by the Bankruptcy Code and Bankruptcy Rules (the "Schedules and Statements"). While I have access to certain of the Debtors' books and records, they are not in a state to prepare full and accurate schedules.

16. When the Debtors are able to rehire the necessary personnel, they will be working simultaneously on restarting operations and gathering the necessary information to prepare the Schedules and Statements. I believe that additional time to file the Schedules and Statements so that the employees and contractors are not distracted from preserving and maximizing the value of the estate during the restart.

17. Based on the foregoing, I directed proposed counsel to the Debtors to file the Debtors' Emergency Motion for An Order Extending the Time to File the Schedules and Statements Required by Rule 1007 of the Federal Rules of Bankruptcy Procedure. I believe that the relief sought therein is necessary for the Debtors to prepare full and accurate Schedules and Statements without harming the Debtors' efforts in restarting operations.

[*Signature Page Follows*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated: April 2, 2026                                          By: _____

                                                                  Robert T. Black